<u>**NOT FOR PUBLICATION**</u>

**FILED**

JAMES J. WALDRON, CLERK

**MARCH 26, 2008**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  <u>s/ Ronnie Plasner,</u> DEPUTY

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

In Re:

**SUMMIT GLOBAL LOGISTICS, INC.,**
*et al.,*

                    Debtors.

**(Jointly Administered under**
 **Case No. 08-11566)**

Case Nos. 08-11566, 08-11568, 08-11573,
08-11574, 08-11577, 08-11579, 08-11580,
08-11581, 08-11584, 08-11588, 08-11591,
08-11593, 08-11595, 08-11597, 08-11599,
08-11600, and 08-11601

Chapter 11

Judge: Donald H. Steckroth, U.S.B.J.

<u>**OPINION**</u>

**APPEARANCES:**

Lowenstein Sandler PC
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Bruce Buechler, Esq.
Sheila Sadighi, Esq.
Michael Savetsky, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
***Counsel to the Debtors and Debtors in
Possession***

Holland & Knight, LLP
Sandra E. Mayerson, Esq.
195 Broadway
New York, New York 10007
***Counsel to the Independent Board of
Directors of the Debtors***

Goodwin Procter LLP
Emanuel C. Grillo, Esq.
599 Lexington Avenue
New York, New York 10022
***Co-Counsel for TriDec Acquisition Co., Inc.***

Gibbons P.C.
Geraldine E. Ponto, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
***Co-Counsel for TriDec Acquisition Co., Inc.***

Morrison & Foerster LLP
Brett H. Miller, Esq.
James M. Bergin, Esq.
Melissa A. Hager, Esq.
Todd Goren, Esq.
1290 Avenue of the Americas
New York, New York 10104-0050
***Co-Counsel for Fortress Credit Corporation***

Sills Cummis & Gross, P.C.
Andrew H. Sherman, Esq.
Boris I Mankovetskiy, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
***Co-Counsel to Fortress Credit Corporation***

Paul, Weiss, Rifkind, Wharton & Garrison
LLP
Kelley A. Cornish, Esq.
1285 Avenue of the Americas
New York, New York 10019-6064
***Co-Counsel to Jointly Represented Holders
of Secured Convertible Notes***

Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Sirota, Esq.
Kenneth L. Baum, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
***Co-Counsel to Jointly Represented Holders
of Secured Convertible Notes***

2

United States Department of Justice
Office of the United States Trustee
Kelly Beaudin Stapleton
United States Trustee, Region 3
Donald F. McMaster, Esq.
One Newark Center, Suite 2100
Newark, New Jersey 07102

Okin, Hollander & DeLuca, L.L.P.
Paul S. Hollander, Esq.
One Parker Plaza
Fort Lee, New Jersey 07024
***Counsel to the Examiner, Perry M.
Mandarino, CPA***

Saiber LLC
Nancy A. Washington, Esq.
Mark A Roney, Esq.
One Gateway Center, 13th Floor
Newark, New Jersey 07102-5311
***Counsel for Hecny Transportation Limited
and Hecny Shipping Limited***

Bell, Boyd & Lloyd LLP
Irving B. Levinson
John S. Delnero
70 West Madison Street, Suite 3100
Chicago, Illinois 60602
***Counsel for Hecny Transportation Limited
and Hecny Shipping Limited***

Fleischer, Fleischer & Suglia
Nicola G. Suglia, Esq.
Plaza 1000 at Main Street, Suite 208
Voorhees, New Jersey 08043
***Counsel for VFS Leasing Company***

Forman, Holt, Eliades & Ravin, LLC
Daniel M. Eliades, Esq.
80 Route 4 East
Paramus, New Jersey 07652
***Counsel for Inter-Tel Leasing, Inc.***

Dechert LLP
Ronald Hewitt, Esq.
Princeton Pike Corporate Center
997 Lenox Drive
Building 3, Suite 210
Princeton, New Jersey 08543
***Co-Counsel for Port LA Distribution Center
II, L.P.***

Schnader Harrison Segal & Lewis LLP
Richard A. Barkasy, Esq.
Michael J. Barrie, Esq.
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002-1165
***Counsel for 800 Federal Blvd, LLC and its
parent entities AMB Property Corp. & AMB
Institutional Alliance Fund III, L.P.***

Law Offices of Andrew Sklar, P.C.
Andrew Sklar, Esq.
411 East Route 70, Suite 200
Cherry Hill, New Jersey 08034
***Counsel for Center Capital Corporation***

Dressler & Perters, LLC
Dennis A. Dressler, Esq.
Christian A. Jorgensen, Esq.
111 West Washington Street, Suite 1900
Chicago, Illinois 60602
***Counsel for Center Capital Corporation***

3

Carella, Byrne, Bain, Gilfillan, Cecchi,
Stewart, & Olstein, P.C.
Jeffrey A. Cooper, Esq.
Marc D. Miseli, Esq.
5 Becker Farm Road
Roseland, New Jersey 07068
**Counsel for Flagler Development Corp.**

Duane Morris LLP
Margery Reed, Esq.
30 South 17th Street
Philadelphia, Pennsylvania 19103-4196
**Counsel for The ACE Companies`**

Peretore & Peretore, P.C.
Frank Peretore, Esq.
191 Woodport Road
Sparta, New Jersey 07971
**Counsel for General Electric Capital**

Brown Rudnick Berlack Israels LLP
Andrew Dash, Esq.
Raymer McQuiston, Esq.
Seven Times Square
New York, New York 10036
**Special Corporate Counsel to the Debtors**

Latham & Watkins LLP
Alan Kraus, Esq.
One Newark Center
Newark, New Jersey 0710-3174
**Counsel for Gordian Group, LLC**

4

## THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE

Before the Court is a motion filed by Summit Global Logistics, Inc. and its jointly administered affiliates[1] (hereinafter collectively referred to as "SGL" or "Debtors") pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, seeking approval to sell substantially all of the Debtors' assets ("Assets") to TriDec Acquisition Company (hereinafter "TriDec" or "Purchaser")[2] under the terms as set forth in the Asset Purchase Agreement ("APA") and described below. Opposition was filed initially by the United States Trustee, the Jointly Represented Holders of Secured Convertible Notes[3] ("CNs"), and Hecny Transportation Limited and Hecny Shipping Limited (hereinafter collectively referred to as "Hecny").

The Debtors also move to assume and assign certain executory contracts and unexpired leases pursuant to Section 365 in conjunction with the instant sale motion. Opposition was filed by eight lessors of real property, equipment, and insurance holders ("Objectors"). The Debtors, TriDec, and the individual Objectors reached consensual arrangements to resolve such objections to cure

---

[1]The jointly administered Debtors are: (1) Summit Global Logistics, Inc.; (2) AmeRussia Shipping Company, Inc., (3) AMR Investments, Inc.; (4) Clare Freight Los Angeles, Inc.; (5) Fashion Marketing, Inc.; (6) FMI Express Corp.; (7) FMI Holdco I, LLC; (8) FMI International Corp.; (9) FMI International Corp. (West); (10) FMI International LLC; (11) FMI Trucking, Inc.; (12) Freight Management LLC; (13) Maritime Logistics US Holdings Inc.; (14) SeaMaster Logistics, Inc.; (15) Summit Logistics International Inc.; (16) TUG New York, Inc.; and (17) TUG USA, Inc.

[2]The assets and stock of AmeRussia Shipping Company, Inc. and AMR Investments, Inc. are excluded from the Asset Purchase Agreement between TriDec and the Debtors and are currently not at issue before this Court.

[3]The CNs are: (1) Alexandra Global Master Fund Ltd.; (2) Bay Harbour Master Ltd. and certain affiliates; (3) CAMOFI Master LDC; (4) Dorset Management Corporation (an affiliate of Knott Partners, L.P and other entities); (5) Evolution Master Fund Ltd. SPC, Segregated Portfolio M; (6) Gottbetter Capital Master, Ltd.; (7) Harvest Capital LP and certain affiliates; (8) JMG Capital Partners and JMG Triton Offshore Fund; (8) Radcliffe SPC, Ltd. for and on behalf of the Class A Segregated Portfolio; and (9) Silver Oak Capital, L.L.C., who hold in aggregate approximately ninety-percent (90%) of the face amount of the Secured Notes (excluding the Secured Notes held by members of the Debtors' management).

amounts and adequate assurance of future performance. Any remaining objections will be resolved

at a later date after which the Debtors will report the results to the Court or file a motion by April 11,

2008 to reject executory contracts or unexpired leases.

The Court has jurisdiction pursuant to 28 U.S.C. § 1334, and the Standing Order of

Reference from the United States District Court for the District of New Jersey dated July 23, 1984.

These matters are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (D), (M), (N) and (O).

Venue is proper under 28 U.S.C. §§ 1408 and 1409.  For any and all reasons stated hereafter, the

Debtors' motion for approval for the sale of substantially all of its assets to TriDec is hereby granted.

## Statement of Facts and Procedural History

### A.    Introduction[4]

Each of the jointly administered Debtors filed a voluntary petition for relief under Chapter

11 of the Bankruptcy Code on January 30, 2008 ("Petition Date"). The Debtors continue to operate

their businesses as debtors in possession pursuant to Sections 1107 and 1108.   A creditors'

committee was not formed in the instant matter due to insufficient interest.

Summit Global Logistics, Inc. ("SGL") is a publicly held Delaware corporation with a

number of wholly-owned, autonomous subsidiaries operating as single business units providing

ocean transportation, freight, customs brokerage, warehouse, rail, and trucking services across the

United States and internationally. SGL's stock is quoted on the NASD's Over-the-Counter Bulletin

Board.  SGL was formed as a Nevada corporation in February 2004, under the name "Aerobic

Creations, Inc.," and was reincorporated as a Delaware corporation in August 2006 through a

---

[4]The background information in the Introduction is stated in *Certification in Support of First Day Applications and Motions*, by Robert Agresti, Chief Executive Officer of Summit Global Logistics, Inc., Maritime and affiliated subsidiaries ("*Agresti Certification*").

migratory merger. On February 6, 2006, Maritime Logistics US Holdings, Inc. ("Maritime"), also

a Delaware corporation, was formed. During 2006, Maritime acquired AmeRussia Shipping

Company, Inc.,  AmeRussia Ltd., SeaMaster Logistics (Holding) Ltd., FMI Holdco I, LLC, and

TUG and established Summit Logistics International, Inc. The merger with Maritime turned the

public shell of SGL into a meaningful business operation.

Summit Logistics International, Inc. is located in East Rutherford, New Jersey.  In November

2007, the government of the People's Republic of China authorized the SeaMaster operations to

provide logistics services at most hubs in China. The Debtors  operate four principal places of

business: East Rutherford, New Jersey, Los Angeles, California, Hong Kong, and St. Petersburg,

Russia.  They have agency relationships in various countries across the globe, which expands their

operations.

The logistics industry is highly regulated and susceptible to seasonal trends. The Debtors'

business structure provides logistics requirements to the entire supply chain with a focus on the

development of global accounts. The Debtors face increased competition from small international

firms that provide global services and logistics solutions.

**B.**    **Relevant Events Prior to Petition Date**[5]

On November 6, 2006, the Debtors entered into a Loan Agreement with Fortress Credit

Corporation[6] ("Fortress") whereby Fortress extended a loan to the Debtors totaling $65 million,

---

[5]The information regarding the pre-petition financing and timeline of events prior to the Petition Date are gleaned from the *Agresti Certification* and the *Initial Report of Perry M. Mandarino, CPA, Examiner*.

[6]Fortress Credit Corporation is the administrative and collateral agent for and on behalf of the following Lenders: Fortress Credit Opportunities I LP, Fortress Credit Opportunities II LP, Fortress Partners Fund LP, Fortress CLO GP LLC, Fortress Credit Funding III LP, Fortress Credit Funding IV LP, Ableco Finance LLC, and Plainfield Direct LLC.

including $10 million in revolving credit and for letters of credit, and $55 million in term loans. Fortress provided the Senior Secured Credit Facility with a lien on SGL's assets. In addition, to finance the Maritime 2006 acquisitions, Maritime entered into a securities purchase agreement by which buyers purchased secured notes totaling $65 million where the notes are convertible to SGL common stock shares at $11.00 per share and warrants to acquire forty percent (40%) of the number of shares upon the conversion of the notes exercisable on November 6, 2011, also at $11.00 per share. This financing was secured by a second lien on SGL's assets.

Prior to the Petition Date, the Debtors suffered from a severe liquidity crisis due to changed market conditions and a loss of certain customers' business. The Debtors integrated various businesses, but achieving the desired efficiencies took longer than anticipated.   In April 2007, the Debtors and Fortress entered into a Forbearance Agreement due to the Debtors' defaults including failure to timely provide monthly financial statements and compliance certificates for December 2006 and January 2007.

In May 2007, the Debtors restructured their financing including: (i) an Amendment of the Debtors' existing $65 million credit facility; (ii) restructuring of the $65 million convertible notes and warrants; (iii) private placement of senior secured convertible notes totaling $15 million in new money from the existing convertible note holders ($12.5 million) and certain management members ($2.5 million); and (iv) a waiver of certain accrued registration rights penalties. This restructuring sought to realign the Debtors' financial obligations with their intended revenue and reporting requirements. Fortress waived all of the events of default and the Debtors paid $265,000 and increased the interest rate on their Senior Secured Credit Facility.

The Debtors also negotiated a restructuring of the convertible notes for amended and reinstated notes to align with their expected future performance by accepting additional notes and a deferral of $8 million in interest payments for five consecutive quarters.  While this May 2007 restructuring provided temporary relief from the liquidity crisis, it resulted in a more highly leveraged capital structure with even less room for error in the execution of the Debtors' business plan.

After the May 2007 restructuring, the Debtors' Board of Directors instructed Raymond James & Associates to seek out a replacement for the Senior Secured Lienholders, but those efforts were unsuccessful. Thereafter, in June and July 2007, two other financial advisory institutions, Alvarez & Marshal LLC and RAS Management, were retained to assist with financial modeling. Those relationships were terminated in July 2007 and November 2007, respectively.

In July 2007, the Board of Directors retained Lowenstein Sandler PC ("Lowenstein") to explore the possibility of a prepackaged bankruptcy and other restructuring options. As of July 30, 2007, the Debtors breached the financial covenants agreed to under the May 2007 restructuring. As it became apparent that a refinancing or replacement of the Senior Secured Credit Facility was unlikely, the Debtors began discussions for an asset sale in August 2007, particularly with CMA CGN ("CMA") as a potential purchaser. At this time, an Independent Committee of the Board of Directors was formed to oversee the sale process and liquidity crisis.  The Independent Committee retained Holland & Knight in November 2007 as its counsel.

Additionally, in the Fall of 2007, the Debtors explored a restructuring plan with the CNs and a conversion of the term loan to a revolver with Fortress.  These negotiations did not materialize into a restructuring plan particularly because SGL was unable to agree with the CNs as to the

9

appointment of a Chief Restructuring Officer, and the granting of a substantial percentage of the company to the CNs alone with two Board of Director seats. The Debtors' outstanding debt with the CNs totaled approximately $85 million and held a junior position to Fortress's senior debt.

On October 29, 2007, the Board of Directors retained Gordian Group, LLC ("Gordian") to advise on maximizing SGL's value through restructuring, recapitalization, sale or merger both in and outside of bankruptcy. During the hearing before the Court, David Herman, of Gordian, testified to two proposed transactions – one with a strategic investor and one with a financial institution, neither of which materialized. On October 8, 2007, SGL received a letter of intent from CMA, the strategic investor, with a proposed purchase price of $110-$120 million in cash. However, upon further due diligence through the Fourth Quarter of 2007, the indicated purchase price was reduced to $65 million plus management compensation. Finally, on January 22, 2008, CMA notified SGL that it was unable to continue with the acquisition due to current market conditions and the distressed financial situation of SGL.

In December 2007, while the CMA negotiations were still ongoing, certain members of SGL's Management[7] approached EOS, a private equity fund with logistics industry experience, about a potential buyout with Management's participation. EOS's letter of intent proposed a sale for $55-$60 million. However, once again after further due diligence, EOS advised that it would only act as a stalking horse if it were able to acquire the Senior Secured Credit Facility for $25-$30 million, a proposition to which Fortress objected. After the bankruptcy filing, EOS declined further participation.

---

[7]"Management" consists of Gregory DeSaye, Joseph DeSaye, Robert Agresti, Robert O'Neill and Neil Devine, along with others.

In December 2007, TriDec was formed consisting of Management including Gregory DeSaye, Michael DeSaye, Joseph DeSaye, Robert Agresti, Robert O'Neill, Robert Wu, Robert Lee, and Jerry Huang. At this time, SGL began negotiating with TriDec and the CNs to develop an "internal plan of reorganization" whereby the CNs and Management would infuse capital, the Senior Secured Credit Facility would be paid down, and the CNs would acquire majority ownership of SGL. Several proposals transpired throughout December 2007 and January 2008, but the parties were unable to reach an accord.

In early January 2008, Gordian approached Fortress to determine if it would finance TriDec as a stalking horse bidder. Term sheets and related Debtor in Possession Financing ("DIP Financing") were negotiated resulting in the proposed Asset Purchase Agreement filed with the instant sale motion on January 30, 2008 at the time of the petition filing. The TriDec acquisition initially proposed: (i) repayment of pre-petition debt of $2 million held by Fortress, (ii) repayment of Fortress's DIP loan of up to $5 million, (iii) assumption of the $2 million SeaMaster note, (iv) assumption of the $6.7 million in critical vendor payments, (v) assumption of the cure costs on executory contracts and unexpired leases, and (vi) a cash infusion of from Management.

## C.    Post-Petition Events

After the bankruptcy filing on January 30, 2008, the Debtors filed various "first day motions" including motions to approve "critical vendor" payments, DIP financing, and the instant sale motion. At the First Day hearing on February 1, 2008, the objections to the DIP financing were resolved and Fortress extended $2 million immediately and up to $3 million post-sale closing to be repaid through the sale proceeds. This DIP financing was necessary as existing cash collateral was insufficient for the Debtors' operations. The $3 million is to be used as a wind-down budget by the Debtors.

11

As a result of the failure to form a creditors' committee, the United States Trustee moved for the appointment of an Examiner to investigate and evaluate the Debtors' sales and marketing efforts that resulted in the proposed asset sale to TriDec. The United States Trustee's concerns stemmed from the proposed sale to members of Management and the expedited basis for such sale. Hecny supported the United States Trustee's motion while the Debtors opposed the appointment of an examiner. The Court authorized the appointment of an examiner and the United States Trustee's office selected Perry Mandarino, CPA ("Examiner").

1.      **Findings of the Examiner**[8]

On March 17, 2008, the Examiner filed his approximately forty-page report analyzing SGL's relevant timeline to date, the Debtors' sale and marketing efforts, and Fortress's liens. The Court hereby incorporates by reference the entirety of the Examiner's Report.

The Examiner reported that Gordian contacted approximately fifty-six (56) firms pre-petition, including strategic and financial institutions, regarding acquisition of the Debtors' assets. Additionally, Gordian approached approximately ten to fifteen institutions that specialize in refinancing or investing in distressed debt. Of these institutions, twenty-three (23) entered into confidentiality agreements and five (5) conducted further due diligence. To facilitate the due diligence requirements of the potential purchasers, the Debtors established a data room containing business, financial and legal information. The Examiner noted that although TriDec consisted of Management, TriDec was not privy to information different from that contained in the data room available to all potential purchasers or investors.

---

[8]The information in this section is located in the Examiner's Report and stated on the record during the hearings on March 20, 2008 and March 24, 2008.

Post-petition, Gordian contacted twenty-two (22) additional entities with one strategic and one financial institution conducting further due diligence. Bison Capital (including its portfolio company, Performance Team Freight Systems, Inc.) (hereinafter "Bison") conducted extensive due diligence and negotiations with Management and the CNs.  On March 13, 2008, Bison and TriDec reached an agreement by which TriDec would complete the proposed APA transaction, Bison would invest in TriDec, and facilitate the refinancing of TriDec's senior secured debt and merger of TriDec with another entity.  In conjunction, as part of the resolution reached between the Debtors and the CNs, as discussed below, the CNs would receive twenty-five percent (25%) of the common equity in TriDec. The CNs stated at the sale hearing that completion of the Bison transaction within Section 363 would have been preferred, but time restraints prevented significant due diligence from being completed by both Bison and TriDec providing reason for Bison to withhold participation in an auction process.

Although Gordian approached approximately seventy-eight (78) potential investors pre- and post-petition, the Examiner submits that the following four factors may have acted as deterrents to potential purchasers: (1) the Debtors' performance issues leading to the liquidity crisis; (2) the "headwinds" impacting the industry including increased competition and margin compression; (3) the Debtors' pre-petition debt and the CNs' ability to credit bid their claim; and (4) the limitations that Management posed on potential buyers due to their customer, supplier, and employee relationships vital to the business. On March 18, 2008, the deadline for bid submissions, the only remaining open bid was that of the Stalking Horse, TriDec;  all other potential bidders withdrew from negotiations.

13

In analyzing the sale, the Examiner reviewed and evaluated the role of Fortress, Management, and the CNs. The relationship between Fortress and the Debtors had become strained due to the Debtors' defaults. Thus, when the proposals of CMA and EOS did not materialize, Fortress entertained a Management based deal. Fortress, as the senior secured lender, was concerned with the full repayment of its outstanding debt and recognized management to be an integral component to any proposed transaction due to its expertise and relationships in the industry.

The CNs have held a crucial position in this case from the outset. During the First Day Matters' hearing, the CNs argued strident objections to the Debtors' proposed DIP financing and proposed sale as the $85 million due and owing to the CNs would not be satisfied through the proposed APA. The primary interested parties in this case at all times operated under the realization that a sale was unlikely to generate proceeds to satisfy the total amount owed to secured lenders. Thus, the CNs negotiated the resolution discussed below.

2.      **Stipulation Between the Debtors and the Convertible Noteholders**

Due to the approximately $85 million in outstanding debt owed to the CNs, from the outset of the case, the CNs and the Debtors engaged in negotiations to reach a consensual agreement allowing endorsement by the CNs of the Debtors' proposed sale to TriDec. A consensual resolution between these parties was integral to a successful asset sale by the Debtors since the original proposed APA did not provide any recovery to the CNs and a sale without their consent or payment of their loans was legally impermissible.

Specifically, the CNs, the Debtors, and Fortress have agreed that the potential purchasers, TriDec and Fortress, will fund the resolution with the CNs with no change to the proposed purchase price. The CNs (now calling themselves the Junior Secured Noteholders) will receive 25% of

TriDec's common stock, Management will receive 50.1%, Fortress will receive 15% and an employee and management option pool will be 9.9%. Additionally, at closing of the sale, TriDec will pay the CNs' professional fees and costs not to exceed $990,000.00 with $600,000.00 to be paid by Management and the remainder to be paid from the Fortress loans to be made in conjunction with the sale. The CNs agree to withdraw their objections to the DIP financing and the proposed sale with prejudice and now support the TriDec acquisition. The resolution also proposes the exchange of general releases among the Debtors, Fortress, and the CNs. However, at the request of the United States Trustee, such releases do not include directors, officers, shareholders, members, partners, affiliates, attorneys, and advisors. The resolution also provides that upon the approval of the TriDec transaction, the parties will enter into a "Follow-Up Transaction" whereby a third-party will commence an additional acquisition subject to the Term Sheet filed under seal in conjunction with this Stipulation and Order. This stipulation further provides that this Court will retain jurisdiction over any resulting dispute arising out of this stipulation.

### 3.    Summary of Proposed APA

The following summarizes the critical terms of the proposed sale for which the Debtors seek approval:

(a)    TriDec will acquire, *inter alia*, all right, title and interest of the Debtors' properties and assets; all cash and cash equivalents; all Accounts Receivable; all "Critical Vendor" contracts; all acquired shares of the Purchased Entity, SeaMaster Hong Kong; and all goodwill and other intangible assets associated with the Business or the Purchased Assets.

(b)    Management will provide a cash infusion of $8 million whereby $5 million will pay down the DIP Financing provided by Fortress and $3 million will become working capital for TriDec.

(c)    The Bison deal will go forward after the TriDec acquisition as discussed above.

15

(d)     The CNs will receive compensation in the form of common stock and payment of professional fees and costs as outlined above.

(e)     The secured debt owed to Fortress will be satisfied from the sale proceeds.

(f)     TriDec will not acquire any potential avoidance actions in this case or causes of action against, *inter alia*, directors, officers, shareholders and members.

(g)     All assumed contracts as listed in Schedule 2.1(a)(v).

**D.     Hecny's Objection to the Debtors' Substantial Sale of Assets**[9]

Throughout the progression of this case, Hecny, a direct competitor and an unsecured creditor of the Debtors, has put forth ardent objections to the Debtors' efforts to sell their assets. Hecny alleges that the Debtors misappropriated Hecny's assets in the Spring of 2007 facilitated by the departure of Jerry Huang from Hecny to the Debtors and the creation of a shell company with Huang's wife, Han Huy Ling, as the Managing Director. Based on these actions and the supposed misappropriation of assets, Hecny instituted actions against Huang in Hong Kong and in the United States District Court for the District of New Jersey seeking monetary damages prior to the Petition Date. Hecny failed to seek injunctive relief in either of those actions.

Hecny's allegations against Huang stem from  prior relationship with the SeaMaster Logistics (Hong Kong) entity.  SGL acquired SeaMaster Logistics (Hong Kong) through its wholly-owned subsidiary, SeaMaster Logistics (Shanghai) Ltd.  SeaMaster Logistics (Hong Kong) and SeaMaster Logistics (Shanghai) Ltd. are non-debtor subsidiaries of SGL through the Debtor subsidiary SeaMaster Logistics, Inc. *Hearing Exs. H-P & H-R.*  One of the assets being sold in the instant sale is the stock of the non Debtor SeaMaster Logistics (Hong Kong) with all assets and liabilities being assumed by the purchaser. *See APA Section 2.1(b).*  Hecny alleges Huang and Ling

---

[9]The information in this section is gleaned from Hecny's various objections to the Debtors motions to date and the testimony of Bernard So, Corporate Vice President of Hecny, heard on March 20, 2008.

are greatly benefitting from the sale but, pursuant to the APA, Huang and Ling only receive a potential incentive earnout of up to $10 million achieved upon certain benchmarks being met. This potential earnout has been fully disclosed as the proposed APA has been an exhibit to the instant motion as well as the Debtors' 8-K since the outset of this case.

Throughout the Debtors' bankruptcy case, Hecny has repeatedly argued that the Debtors misappropriated assets, without identifying those assets or property. Bernard So, Vice President of Hecny, testified that the Misappropriated Assets include Hecny's employees, business relationships, and trade secrets. He could not identify any specific property or asset. Through the cross-examination of Robert Agresti, Hecny finally alleged that Hecny's customer list (the only tangible asset raised) was misappropriated, however, that asset at best is held by a non-debtor entity and is not being sold. As stated previously, the Debtors are only selling SeaMaster China's stock free and clear with the purchaser assuming assets and liabilities. Thus, Hecny's rights as to any specific asset related to such stock are preserved.

In opposition to the proposed sale, Hecny contends the following: (i) the Debtor proposes to sell assets belonging to Hecny, thus, assets that are not property of the estate; (ii) Hecny's claims cannot be reduced to monetary judgments; (iii) Hecny has been denied due process in the sale process and its day in court on its allegations; (iv) Hecny's claims against TriDec cannot be enjoined; (v) TriDec as insiders are not purchasing the assets in good faith pursuant to Section 363(m); (vi) the proposed sale provides no recovery for administrative claimants or unsecured creditors; (vii) the sale motion constitutes a *sub rosa* plan in violation of Section 1129; (viii) the proposed sale is a mere loan modification and an improper use of the Bankruptcy Code; (ix) there is no business justification for the insider sale; and (x) if the sale were approved, then the proceeds

17

should be placed in escrow until the resolution of Hecny's allegations regarding the Misappropriated Assets.

## Discussion

The Debtors filed the instant motion seeking approval to sell substantially all of its assets pursuant to Sections 363(b)(1) and 363(f). In pertinent part, Section 363(b)(1) provides: "The trustee, [or debtor in possession]  after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ."  11 U.S.C. §363(b)(1) (2008); 11 U.S.C. § 1107 (2008).  Section 363(f) states:

> The trustee [or debtor in possession] may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or
> >
> > (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (2008). In addition, Section 363(m) articulates the "good faith" requirement of a Section 363 asset sale whereby:

> (m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

18

11 U.S.C. § 363(m) (2008).  A finding of good faith is also required under the substantive law of the Third Circuit found in *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) ("[W]hen a bankruptcy court authorizes a sale of assets pursuant to *section 363(b)(1)*, it is required to make a finding with respect to the "good faith" of the purchaser.").

From the outset of these bankruptcy proceedings, the Debtors acknowledged the insider nature of the proposed transaction. The Debtors bear the burden of proving that they have satisfied the requirements of Section 363(f), the good faith finding under Section 363(m), and the heightened scrutiny required by non-bankruptcy law for insider transactions.  *See In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 2000, at *13 (Bankr. N.D.N.Y. January 22, 2007) (recognizing the insider nature of a transaction requires heightened scrutiny); *In re Medical Software Solutions*, 286 B.R. 431, 455 (Bankr. D. Utah 2002) ("[W]hen a pre-confirmation [Section] 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be 'closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization.'").  Furthermore, since the proposed transaction is outside the ordinary course and prior to chapter 11 plan confirmation, the Debtor must also prove that there is a sound business justification for the transaction pursuant to the seminal case of *In re Lionel Corporation* allowing a bankruptcy court to make findings of fact as to the sale. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Exaeris, Inc.*, 380 B.R 741, 744 (Bankr. D. Del. January 15, 2008) (articulating that substantial sale of assets outside of a chapter 11 plan is not unusual but requires careful bankruptcy court scrutiny as to business judgment).

In accordance with *Lionel* and subsequent precedent within the Third Circuit, Debtors must prove the following: (1) a sound business purpose for the sale; (2) the proposed sale price is fair; (3)

the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith.

*In re Exaeris, Inc.*, 380 B.R. at 744; *accord In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). *Lionel* provides the following factors for the Court to consider:

> [T]he proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*In re Lionel Corp.*, 722 F.2d at 1071. In the instant matter, in the absence of a creditors' committee, the Examiner's Report provides the analysis on which the Court bases much of its findings. Furthermore, as Fortress noted at the hearing to determine the necessity and scope of the proposed Examiner, the Examiner's Report also assisted the Debtors in satisfying their burden as to the merits of the proposed Section 363 sale.

## A.    Sound Business Justification

As to the sound business purpose requirement, the Debtors, from the inception of their chapter 11 case, have demonstrated the liquidity crisis they presently still experience. The Examiner's Report provides evidence of the Debtors pre-petition liquidity crisis resulting in the defaults on the Fortress Loan Agreement. *Examiner's Report*, 14-18. Robert Agresti testified to the Debtors' continued liquidity problems at the sale hearing noting that the Debtors have exhausted their DIP loan of $2 million leaving an asset sale or capital infusion as the only remaining solutions. *March 20, 2008 Hrg. Tr.* at _____.

The Debtors, the Senior Lenders, and the CNs have all acknowledged that the failure to consummate a sale at this juncture will result in a complete shut down of the Debtors' operations.

Courts have recognized that a going concern sale proves more lucrative than a non-operational entity. *See, e.g.*, *In re Cummins Utility, L.P.,* 279 B.R. 195, 198 (Bankr. N.D. Tex. 2002) ("It was the hope of the parties that more might be realized through a sale of assets in an operating configuration than if the business were shut down and the assets sold through a traditional liquidation. Though the Court had serious concerns about the use of Chapter 11 to effect a sale of all assets pursuant to 11 U.S.C. § 363, it was persuaded by the parties that Debtor's business was rapidly deteriorating."). As the *Lionel* Court stated, an important factor is whether the assets are increasing or decreasing in value. *See In re Lionel Corp.*, 722 F.2d at 1071. Here, the Debtors maintained in the instant motion that there is much uncertainty as to their future performance due to loss of customer and vendor confidence and competition in the industry. David Herman of Gordian testified at the sale hearing that SGL is a "melting ice cube" and that a "stake in the ground" was vital to maintaining its customer base. *March 20, 2008 Hearing Tr.* at _____. Herman also submitted that a sale would result in a less onerous capital structure whereby the acquiring company will be able to move forward under an operating plan led by Management and financially capable institutions. *March 20, 2008 Hearing Tr.* at _____. The Debtor has no real alternative but to complete a sale as a going concern. To ignore the liquidity crisis would be irresponsible.

**B.      Fairness of Proposed Sale Price**

The Debtors must also prove that the proposed sale price is fair. The Examiner explored the reasonableness of TriDec's proposed purchase price and concluded that TriDec's bid of approximately $65-$70 million represented a fair valuation of the assets. *Examiner's Report*, at 38. The Third Circuit has recognized "an auction may be sufficient to establish that one has paid "value" for the assets of the [debtor]." *In re Abbotts Dairies,* 788 F.2d at 149. In this case, particularly

because the Debtors are a public company, a market-based valuation is proper. The Third Circuit promotes market-based valuations and reliance upon stock price reasoning that "[e]quity markets allow participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate. . .further not[ing] that market capitalization reflects all the information that is publicly available about a company at the relevant time of valuation." *Statutory Comm. of Unsecured Creditors of Iridium Corp. v. Motorola, Inc. (In re Iridium Operating LLC et al.)*, 373 B.R. 283, 347 (Bankr. S.D.N.Y. 2007) (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)  and *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988)). Here, the Examiner's Report and Herman's testimony established that the Debtors and Gordian engaged in negotiations with several proposed purchasers all of whom either reduced substantially their initial proposals or withdrew their offers after conducting extensive due diligence through March 2008. No additional bids were submitted prior to the bidding deadline on March 18, 2008 and no auction occurred, reflecting the market's view of SGL. Thus, the bid of TriDec of approximately $65-$75 million proved to be the highest and best economic offer  received for the Debtors' assets according to the testimony of Herman and the conclusion reached in the Examiner's Report.

## C.    Adequate and Reasonable Notice

Particularly given the insider nature and the expedited basis for the Debtors' proposed sale, adequate and reasonable notice are imperative here. The Debtors filed the instant motion for bidding procedures and approval of its Section 363 sale on January 30, 2008. The sale approval hearings occurred on March 20 and 24, 2008, approximately six weeks later. In addition, the Debtors issued an immediate press release following the First Day Hearings on February 1, 2008 indicating their desire to sell assets to TriDec. David Herman of Gordian also testified that the Debtors filed an 8-K

with the Securities and Exchange Commission notifying its investors and the public of the proposed

sale transaction. All of this, coupled with the extensive marketing of the Debtors within the industry,

satisfied the Court that any proposed bidders and objectors to the sale process have received ample

notice and opportunity to be heard.

**D.      Good Faith Requirement**

*In re Abbotts Dairies*, as well as *Lionel*, require a showing of the proposed purchaser's good

faith.  It is this good faith finding that Hecny opposes as it fears that it may have a preclusive effect

on its pending actions in Hong Kong, the United States District Court, and the adversary proceeding

in this case.  Clearly, this Court cannot approve a Section 363 sale without a finding of good faith.

*In re Abbotts Dairies*, 788 F.2d at 149-50.  It is the crucial element of this sale motion and much of

the testimony heard and the Examiner's Report establish the basis on which this Court must make

its finding**.** A good faith finding establishes the "integrity of [a purchaser's] conduct in the course

of the sale proceedings." *Id.* at 147. A court may not find good faith if fraud, collusion or unfair

advantages are determined. *Id.*

**1.      Heightened Scrutiny Required for Insider Transaction**

The Debtors have clearly recognized their burden to prove with heightened scrutiny the

propriety of the proposed insider transaction to TriDec.  The Debtors were required to meet the

requirements of applicable Delaware non-bankruptcy law in the instant motion as SGL is a Delaware

corporation. The Examiner also noted this heightened burden in his report providing that the

Debtors' duty to obtain a fair and adequate price was in conflict with Management's interest in

maximizing its $8 million investment in TriDec. *Examiner's Report*, at 36 (citing *In re Biderman*

*Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ("[S]ales to fiduciaries in chapter 11

23

cases are not *per se* prohibited, 'but [they] are necessarily subject to heightened scrutiny because they are rife with the possibility of abuse.'"")).

The Debtors contend that insider transactions can actually provide benefits to the corporation and its investors. *Debtors' Memorandum of Law in Support of Debtors' Motion to Sell Substantially All of Their Assets and In Response to Objections Thereto ("Debtors' Memo of Law")*, at 11 (citation omitted). They rely upon a safe harbor under Delaware law, Section 144, which provides "a transaction will be sheltered from shareholder challenge if approved by either a committee of independent directors, the shareholders, or the courts." *Id.* at 12 (citing 8 Del. C. § 144(a) and *Oberly v. Kirby*, 592 A.2d 445, 467 (Del. 1991)).  Here, the public nature of an asset sale under Section 363 requiring Bankruptcy Court approval provides the necessary ratification of an insider transaction under Delaware law.

Additionally, the Debtors established an Independent Committee with its own independent retained counsel to oversee the sale process as soon as a potential insider transaction was contemplated. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 709 n.7 (Del. 1983). The Examiner was unable to fully determine the role of the Committee as many of its communications were via email, which have not been provided to the Examiner. The Examiner submits that a truly disinterested fiduciary is ideal, but that was not possible in this case given the exigency of the Debtors' financial condition.  However, the Debtors submit that the Independent Committee, with independent counsel, and Gordian's oversight of the sale process comports with their requirements under both Delaware law and the Bankruptcy Code.  The Court finds that here the transparency of the sale process and the marketing efforts of the Debtors satisfy the Debtors' heightened burden with respect to the proposed Management led transaction with TriDec.

### 2.    Fair and Open Sale Process

A fair and open sale process is crucial to a bankruptcy court's good faith finding. Section 363(m)'s good faith finding provides a proposed purchaser with a final sale preventing disruption of the transaction. *See In re Abbotts Dairies,* 788 F.2d 143, 147 (3d Cir. 1986); *In re Summit Ventures, Inc.*, 161 B.R. 9, 11 (D. Vt. 1993). In the instant matter, the Examiner specifically concluded "the sale of substantially all of the Debtors' assets has been conducted in a fair and open manner intended to maximize the value for the Debtors' assets." *Examiner's Report,* at 6. The Examiner reviewed the sale process and Gordian testified at the sale hearing as to its marketing efforts of the Debtors' assets. Summarily, Gordian contacted more than seventy (70) strategic and financial institutions pre- and post-petition as potential purchasers of the Debtors' assets. The Debtors maintained a data room available to all potential purchasers who executed confidentiality agreements allowing for the provision of the same information to all parties including TriDec. The Debtors' efforts to obtain a suitable purchaser, beginning in August 2007 and culminating with the instant sale hearings, transpired over the course of six months with one potential bidder withdrawing on the date bids were due.

Another element for consideration when looking at the good faith requirement with respect to an insider sale is whether the transaction insulates and provides releases to insiders.  Here, the Debtors and TriDec have agreed, at the United States Trustee's insistence, that any potential avoidance actions will remain with the Debtors' estate and the releases negotiated between TriDec, Fortress, and the CNs as part of their Stipulation do not include directors, officers, shareholders, members, affiliates, and their attorneys. *See In re Exaeris, Inc.*, 380 B.R. 741, 747  (Bankr. D. Del. January 15, 2008) ("What is clear is that a court can and should consider whether an insider is

receiving a release when evaluating the "good faith" criterion.") (citing *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 703-04 (Bankr. E.D. Pa. 1989)).  Thus, the absence of releases is another indication of good faith in this sale.

The realities of the Debtors' financial crisis and the expansive amount of the secured debts of Fortress and the CNs resulted in the proposed transaction with TriDec. Although the Debtors and Gordian marketed the Debtors' assets reasonably and extensively given the circumstances, Fortress would not consent to a proposal that did not satisfy its liens and no proposal was ever sufficient to satisfy the outstanding debt of both the senior and junior secured liens of approximately $140 million.   Thus, absent consent, Section 363(b)(3) could never be satisfied.   The only viable transaction was that proposed by TriDec and Fortress. The CNs objected stridently to the Debtors' proposed DIP financing and bidding procedures, but eventually recognized that the sale process would not provide full satisfaction of their liens. Thus, through their negotiations, the CNs prevented a bar to the sale process by entering into a transaction that provided them a certain recovery as described in the Stipulation between TriDec, Fortress, and the CNs.  The parties with the largest financial stake in the case have all consented to the proposed sale of assets.  Clearly, for the above reasons, the Debtors have satisfied the burden of proving a sale process executed in good faith.

**3.**    **The Debtors' Section 363 Sale Does Not Constitute a *Sub Rosa* Plan**

Hecny submits that the Debtors' proposed insider sale transaction is an impermissible *sub rosa* plan. *Sub rosa* plans are prohibited because they violate the requirements of the Chapter 11 process. *Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007). "[T]he sale of an asset of the estate under [Section] 363(b) is permissible if the 'judge determining [the] [Section] 363(b) application

expressly find[s] from the evidence presented before [him] at the hearing [that there is] a good business reason to grant such an application." *Id.* (citing *In re Lionel Corp.,* 722 F.2d at 1071). Hecny also argues that the sale provides no recovery for administrative claimants. However, the Debtors have $3 million for a wind-down budget to satisfy such claims.

Hecny's reliance upon *In re Braniff Airways, Inc.* is misplaced. In that case, the Court focused upon the releases of claims by all parties as the basis for its finding of a *sub rosa* plan. *In re Braniff Airways, Inc.*, 700 F.2d 935, 939-940 (5th Cir. 1983). However, in the instant matter, the avoidance actions are preserved for the estate and the releases provided through the Stipulation reached between TriDec and the CNs do not include Management or, *inter alia*, directors and officers. *See In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 980, at *38 (Bankr. D. Del. April 2, 2001) (noting *Braniff* addressed the debtor's releases of claims against the estate essentially determining the allowability of the claims through a Section 363 sale). Hecny also argues that the Stipulation reached between the parties impacts the ability to find good faith here. However, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly" and that contention is rejected. *In re Condere Corp.*, 228 B.R. 615, 634 (Bankr. S.D. Miss. 1998) (citing *Official Comm. Of Unsecured Creditors v. Cajun Electric Power Cooperative, Inc. (In re Cajun Electric Power Cooperative, Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997)).

Finally, Hecny was unable to articulate during the hearing what rights it was being deprived of through the proposed sale. Its argument centered around the allegation that the Debtors misappropriated Hecny's assets to establish the Debtors' Asia operations. However, the testimony of Bernard So, Hecny's Corporate Vice President, did not unearth tangible assets that were

misappropriated as alleged in the adversary complaint.  Instead, the allegations revolve around

certain Hecny's customer and business relationships and former employees of Hecny moving to the

Debtors. There are actions pending in both Hong Kong and the United States District Court for the

District of New Jersey where a resolution of these allegations will result and Hecny may prove an

unsecured claim at the time of such disposition.  Nevertheless, an objector arguing that a proposed

sale constitutes a *sub rosa* plan must clearly articulate the rights and benefits the unsecured creditor

is being deprived of through the sale that it would gain through a Chapter 11 plan. *See In re Torch*

*Offshore, Inc.*, 327 B.R. 254, 257 (Bankr. D. La. 2005) (citing *In re Continental Air Lines, Inc.*, 780

F.2d 1223, 1228 (5th Cir. 1986).  Here, Hecny's inability to establish its detriment through the sale

(except to possibly money damages) and the Debtors' satisfaction of the sound business judgment

and good faith requirements given their severe liquidity crisis, mandate a finding that the proposed

asset sale does not constitute a *sub rosa* plan.

## Conclusion

Although Hecny has maintained its strident objections throughout this process, Hecny has

not provided a basis for this Court to deny the instant motion.  Moreover, its rights are preserved

through pending actions in Hong Kong, the United States District Court, and in its Adversary

Proceeding in this Court.  The Debtors satisfied their burden of proof under Sections 363(b) and (f)

to warrant a sale to TriDec. The Debtors demonstrated sound business judgment in the formation

of the proposed transaction given the severe liquidity crisis and the vast amount of secured

indebtedness of Fortress and the CNs.  The Debtors and the Secured Lenders have proposed a

transaction that is the result of a  fair and open sale process facilitated by their investment bankers

that maximizes value and return to interested parties.  The TriDec acquisition allows for a sale as

a going concern, which maximizes the assets' value and constitutes the highest and best offer.
Furthermore, the CNs have negotiated a resolution with TriDec and Fortress allowing the
withdrawal of their objection in exchange for a recovery on their investment that could not otherwise
be satisfied in full.  The Examiner's Report and the testimony heard on March 20 and 24, 2008
provide the basis for this Court's good faith finding, the satisfaction of Section 363(f), and the tests
articulated in *Abbotts Dairies* and *Lionel*.  For the foregoing reasons, the Debtors' motion to sell
substantially all of their assets to TriDec is hereby granted.

An Order in conformance with this Opinion has been entered by the Court and a copy is
attached hereto.

/s / *Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: March  26, 2008